Our fourth case this morning is 20-2056 United States v. Andrew Gallegos. May it please the court, my name is John Bolin of the firm of Bolin and Schall, on behalf of appellant Andrew Gallegos. Now the murder of Adrian Burns, which constitutes the only events underlying the two convictions in this case against Andrew Gallegos, was completely different from the other prison strangulations that form the basis of the charges that the court has been dealing with all morning. There was no order from the top, from the tabla or a key holder or other leader. There was no evidence that either Gallegos brother needed at that time to advance their position in the S&M enterprise or redeem a past transgression. There was no evidence that the interactions with Adrian Burns had anything to do with the drug trafficking of the S&M enterprise. To the contrary, they were personal drug buys in $10 and $20 amounts. There was no evidence that Mr. Burns was in any gang, had any relation to any gang, had any relation to the S&M enterprise, nor that he even knew that Joe Gallegos was a member of the S&M enterprise or another gang. And finally, the method of killing here. It was unlike all of the prison strangulations that the S&M gang had perpetrated before. It was not for the purpose of displaying to other members of the public or other gangs. This crime was committed by the S&M enterprise itself. And that stands in stark contrast to, for example, the 2001 simultaneous strangulations, wherein the tabla ordered that these strangulations occur by that method, strangulation within the prison, so that everyone within the prison community would know that they were perpetrated by S&M. Why does that matter? Because we're in this beautiful federal courthouse today, as opposed to in a state courthouse in New Mexico, because we're dealing with the Vicar Statute or Vicar Statute. Now that's violent crimes in aid of racketeering. And so the government was required to prove, as an element of the crimes with which Mr. Andrew Gallegos was charged, that this crime, the murder of Agent Burns, was perpetrated for purposes of aiding the racketeering enterprise. And the government argues that you can make inferences from the evidence that was presented that fill in the gaps. And in particular, they say that Mr. Burns disrespected Mr. Gallegos, and that it was the culture of the gang that if you were disrespected, you had to respond. And that therefore, the jury could make the inference that the murder was to maintain status in the gang because he was disrespected. Can you respond? I think that's the argument. Can you respond to that? Yes, Your Honor. There are several things that are wrong with that theory. One, I believe my colleague, Mr. Acton, is going to present on behalf of Joe Gallegos, that there's insufficient evidence that Joe Gallegos even heard the offending or supposedly offending statement. But I'd like to jump to the fact that there is no record support for that theory or insufficient record support for that theory. For example, Judge Carson presented the hypothetical earlier in the first argument to Ms. Messick about the man who was disrespected on the yard, and he tells his cellmate to go make the killing, and there's nothing else there. The answer from the government in that case was, well, he was following the rules. And the rules were if you were disrespected, you had to retaliate. But that's not quite true. The government admits that the rules were that a member could not commit a killing like that without an order from above. Specifically, the government's brief at page 7 says, no member was to take action without the approval of the gang's leaders. Like so many other infractions, doing something without permission was another reason for you to get hit. In this case, there was no evidence that there was any order by the tabla or anyone else above. And so actually, Andrew Gallegos and Joe Gallegos would have risked their position in the S&M enterprise by undertaking this unsanctioned killing. In addition, the witness that is presented in the government's answer brief for this retaliation idea, that witness himself admitted in cross-examination, I believe it was cross-examination, that the kinds of disrespect were limited to disrespect as a member of the gang. Personal beefs, he said, didn't apply. So if there was a family matter or a personal matter with a friend or even a waitress at a restaurant or something like that that's not gang-related, then members of the gang were not required to retaliate. I'm sorry, what witness? Who are you talking about here? This is, I addressed this at page 9 of the reply brief, and I don't recall the witness's name at this time. But his testimony is quoted therein at that section of our brief. And remember, there was no gang affiliation here. Was there any other testimony on that issue? On the issue of retaliation? Yes. Not that I'm aware of, standing here today. There was no affiliation between Adrian Burns and any gang at all, and there was no drug affiliation. Adrian Burns was selling for personal use to Joe Gallegos, allegedly to fuel Joe Gallegos' own personal drug addiction. The second point that I would make with regard to the government's theory is that if this court were to sanction that theory, it would sweep in conduct that is outside the limits of the conduct that Congress prescribed or proscribed in this case. The government would have any act of disrespect justify retaliation, and therefore sweep in those acts of disrespect within Vicar as opposed to being a state-level violent crime charge. What about the testimony that Joe killed Mr. Burns because he had a big mouth? Does that in any way help the government fill in the blanks to show the connection with the enterprise? No, Your Honor, because the big mouth comment is much too vague for the jury to draw the specific inference that the government would like this court to find that it must draw. That could include all kinds of other personal interactions with Mr. Burns, especially because there is a lack of evidence, as I believe Mr. Acton will address in more detail, that Joe Gallegos even heard the particular offending statement that the government is pointing to at this point in the case. So with respect to the limits of the statute itself, if the court were to sanction the government's reading of the statute, it would simply be too broad and it would disregard the element of the purpose of the crime being to aid the racketeering enterprise. I would call this the enterprise purpose element. I believe Ms. Messick called it the positional element. But the element is that the crime must have been for the purpose of maintaining or increasing position in the enterprise. And the court has already dealt with a similar case in 2014 called Kamahole, where there was a personal matter with a gang member. I believe it was interference with his relationship with his girlfriend. And the court did not buy into the theory that this kind of retaliation for that kind of slight, all by itself, would justify a vicar purpose or a purpose for the enterprise. Rather, the court focused in on three facts, which are completely different from anything that is found in the conviction of Andrew Gallegos. One was that this man had recruited other gang members to participate in the crime. The second was that all of these gang members wore the signature blue bandana that the gang members used to signify their membership in the gang. And thirdly, that the crime was perpetrated in broad daylight. And this was relevant because that level of brazenness was the signal to others that this was a gang-related crime and not just a personal crime. None of those factors or anything like it is present here, specifically. Couldn't the murder here be the type of murder that would be perpetrated to send a message, let word on the street, get out that they killed him and set him on fire? Isn't that the kind of murder that would send a message not to mess with them? Do I understand the court to mean that that kind of method, if adopted by an enterprise, would signal that it's an enterprise as opposed to an ordinary front-of-the-mill murder? I mean, the purpose, and I don't want to butcher our own case's name, but I mean, the idea was, look, it was done brazenly in the daylight to send a message. I mean, this kind of act sends a message, too, doesn't it? That if you mess with us, we're going to murder you in the most heinous way. Couldn't the jury draw that inference? Well, two points, Your Honor. To be fair, Adrian Burns was killed by gunshot wound to the head, which is a painless crime. But then, of course, his body was burned, which may be the signal that the court is after. That's what I'm getting at. Yes. And I think that that only matters if there is evidence that the enterprise uses this kind of signal to signal that it is that particular enterprise, right? So in Kamahale, the brazenness of the broad daylight crime, I think, must have related to the enterprise, and I believe it did, if you read the opinion. But here, all of the evidence that the jury heard for weeks on end at the lower court's trial was that the S&M signature was strangulation. In particular, in the simultaneous strangulations of 2001, the tabla ordered it must be by strangulation because that's how everyone will know that this is an S&M pattern. And the murder of Adrian Burns just doesn't fit the pattern. If there was some other evidence that the enterprise had changed its pattern, sent signals in different ways, then maybe in that hypothetical world we would have something to talk about. But here, the murder of Adrian Burns over a personal drug debt simply has none of the hallmarks of the S&M enterprise murders that were discussed at length in this case. Well, we have the very—I think it was the first testimony of trial was the shower murder, and I don't think that was a strangulation. Yes, Your Honor, although that murder was brutal in a sense, but yes. In a sense, in a lot of senses. Yes. But it wasn't presented to the jury that this was the signature methodology for S&M to signal that it was an S&M crime. And there's nothing in the record that I'm aware of that shows that that kind of murder was a signal. And again, it's still not the same kind of murder that would act as a signal to others. On Andrew, the only conviction is the Burns murder, right? Yes, Your Honor. It's two counts, one for actual completion of a Vicar murder and the second for conspiracy to commit Vicar murder, the conspiracy being between Andrew and Joe Gallegos. And on the conspiracy, your challenge to the conspiracy, you're arguing there's insufficient evidence that they conspired, not arguing that you have to show that they conspired to do it for a Vicar purpose. That's correct, Your Honor. That is the limit of the conspiracy argument, although of course we do contend that there was insufficient evidence as to both counts that the murder was committed for the purpose of maintaining or increasing position within the enterprise. I mean, isn't there enough for conspiracy on, you know, the testimony that they were seen together and that they lived together, that one of them went and purchased gasoline? And you don't think there's enough there for sufficiency on a conspiracy charge? No, Your Honor. Conspiracy is often proven by circumstantial evidence, which I think the question is getting at. But here, because these two men were brothers and they lived together as brothers and they also worked together as brothers, they would cut up scrap metal to sell, and that's what the jury heard. There just simply isn't anything above and beyond the relationship as brothers who would be involved with each other in speaking that can get us to the next level on conspiracy. Wasn't there testimony that they were the last people seen going to Burns' home and that Burns was not seen afterwards until his body was discovered? No, Your Honor. The testimony was that Burns was going to the home of Joe Gallegos. So they were going to see the Gallegos brothers at that point. And then it's unknown what might have happened, given that the Gallegos brothers lived together. Maybe Joe took him somewhere else first. Was there evidence that Burns supplied heroin that made his way into the prisons? I see that my time is up. May I answer your question briefly? No, there was no evidence that Adrian Burns had supplied any heroin that had gone into drug trafficking or anything else.  All right. Thank you very much. Mapley's Court, counsel. Richard Williams again for the United States. I'll begin where the court left with the conspiracy. And in evaluating the sufficiency, this court must determine whether a reasonable jury could find guilt beyond a reasonable doubt, given the direct and circumstantial evidence, along with the reasonable inferences taken in the light most favorable to the government, and doesn't weigh conflicting evidence or witness or consider witness credibility. With respect to the conspiracy evidence, as was alluded to, there was sufficient evidence that Andrew conspired with Joe, specifically that they were together during the murder. Andrew told Billy Cordova that they had committed the murder. The evidence that Mr. Burns had received a telephone call and told his girlfriend Amber that he was going to the Gallegos to sell them drugs. The fact that it took two people to complete the murder and disposal of the body, one to drive the Burns vehicle to the Bosque site and one to drive the other vehicle, which they then left in. Subsequently, they fled to Albuquerque. As noted in the admission to Billy Cordova, Andrew said that they had stayed solid, that they had killed him, but had walked because nobody had told on each other. They told conflicting post-arrest statements. Back in 2012, with respect to whether or not they both said Mr. Burns had come to the trailer, but with respect to whether or not Mr. Burns had gone inside, they conflicted, which this court can take as evidence of the conspiracy. And furthermore, that Andrew had been seen on video buying gasoline prior to the murder, and there was indications of the gasoline at the site of the fire. If there are no questions about the sufficiency of the conspiracy evidence, I'll turn to the sufficiency of the evidence of the motive. That evidence was indeed sufficient. The S&M rules were that members violently retaliate to disrespect, and that brothers come to the assistance of each other. So they respond to disrespect, any disrespect to them, even if it's not related to the gang? Well, there could be circumstances where a disrespect wouldn't have the sufficient connection to the gang. For example, the road rage incident that was mentioned in the brief, if an S&M member is driving down the road and someone cuts him off, and he doesn't know the other person, and there's no other gang members involved, and he really loses his temper and shoots him as a result of that, what he perceived as disrespect, that might be a very challenging fact pattern to establish it. Another one would be the domestic violence situation where the other person involved was purely personal. It was spontaneous. There was no thought brought into it. There were no other gang members involved or present. There even could be a situation closer to the facts in this case. For example, if Andrew had learned from Joe of this disrespect. How could Joe tell Andrew when there's no evidence that Joe even knew about it? Well, we would submit that the evidence was sufficient that Joe did know about it. And what is the evidence that you point to? Well, in addition to the big mouth comment that Morgan Ramirez said Joe said afterwards, the evidence was that Adrian Burns told Sleepy, this person nicknamed Sleepy, to deliver the disrespectful message to Joe. And then a couple of days later, when Joe left to go to the Gallegos trailer, and Amber, his girlfriend, went to look for him, she went towards the trailer, and Sleepy is who she saw. And Sleepy came to her and told her to leave in no uncertain terms and said that he couldn't snitch a homie out. I think based on those pieces of evidence, the jury could reasonably draw the inference that that message was indeed delivered, as Adrian Burns asked Sleepy to deliver it, and it was received by the Gallegos brothers. Was there any evidence that the Gallegos brothers, Joe and Andrew, were still involved in any gang activity? So with respect to Andrew, he, after the arrest in this case, when he was incarcerated with Billy Cordova, told him about the Burns murder and saying, we got away with it. We would submit that is an S&M member telling another S&M member about an S&M crime, indicating that he was still involved in the gang. They were out for, what, about eight years before the Burns murder? Is that right? I'm not sure about how long they were out of custody. Was there any evidence that prior, between the time that they were released from prison and when the Burns murder occurred, that either Andrew or Joe were engaged in any activities on behalf of S&M? I'm not aware of any evidence there, but the evidence of the S&M was blood in, blood out, and there was no evidence that either had renounced. In 2016, when the search warrant was executed, exhibits were found in Joe Gallegos' bedroom with S&M insignia on them. There was testimony by Jose Gomez, who was the victim, in the 2016 Vicar assault count that he told Joe that he couldn't call a green light on Jose, and Joe disputed that and indicated that that was evidence that they were still active in the gang at the time. In addition, as to the motive evidence, the murder, as per the S&M rules, was indeed violent. The evidence was that they brought Mr. Burns, or he received the call and went, and in Andrew Gallegos' post-arrest statement, he said Joe called him, that he was beaten, he had blunt force injuries around his head, and then the murder, disposal of the body indeed was brazen or flamboyant. Certainly, the jury could draw the inference that it was calculated to be known, that it was going to be something that the public was going to be well aware of, and indeed not just the fire, but the manner in which the body was staged. The pathologist said that Mr. Burns died of a gunshot wound, but the body was found several feet from the vehicle, handcuffed on the ground, knees bent with the bag over its head. The jury could draw the inference that that scene was designed to send a message to all who heard about it. Speaking of those who heard about it, there was evidence that Willie Romero, a former S&M member, approached Joe shortly after the murder, said he had heard that Joe had killed Burns, and he was worried that Romero also was going to be at risk from Joe. Is there any evidence that Burns was supplying drugs for the gang? No. Other than Joe and Andrew, there was no other evidence of that. But there was evidence that Romero knew, somebody told Romero, and that the Gallegos brothers brought in a third person, Jason Van Vigel, to help them clean up the scene, to rip out the carpet in the trailer. So I'd submit that the jury could draw that inference that they did not keep the murder a secret, that they let other people know about it. And indeed, even when Willie Romero confronted Joe, he didn't deny that he had done it. They didn't take steps to keep others from knowing about the murder or about their potential involvement in it. Also, I would note that it was not in their personal interest to kill this person who was supplying them drugs. In fact, that was Andrew Gallegos' opening statement, who kills their drug dealer. His closing argument focused greatly on the lack of evidence that they had done it. And lastly, as to the S&M being aware of it, it is true that Andrew and Joe were biological brothers, but they were also S&M brothers. And the evidence was clear that S&M comes in front of everything, including family. For example, Billy Cordova testified that when his wife had been talking to another S&M member, a sign that could be disrespect, that he assaulted her. And so it is the fact that Andrew and Joe, that they both knew about it, indicates that the S&M knew about it. And that also relates to another example of a type of retaliation crime that might not be covered by Vicar. So, for example, if Andrew had learned from Joe about the disrespect, and Joe had said, Bern said this about me, but I'm not going to do anything. And Andrew said, well, the S&M rules are that you do do something, that you respond when you're disrespected like that, and you're expected by the gang to respond. And Joe says, well, I'm not going to do it. Andrew calls him a name, being disrespectful to Joe. Joe kills him. I would submit that would not be a Vicar crime, but it would be a crime in which there was a retaliation motive. What do you do with the evidence that was brought up by your opposing counsel that they didn't have the authority to have this kind of hit, so that would weigh against it being an S&M-related crime? There were multiple examples of S&M members acting without receiving a specific order from a higher-up. For example, Federico Munoz testified to the barbershop murder where he saw another gang member come in. He recognized him as a gang member. No evidence that the other person recognized Munoz as S&M, and Munoz pulled out a gun and shot him. Mario Rodriguez, the Esparza assault in the shower that was referred to earlier, he did not have. There's no evidence that he received an order or an authorization in order to respond to that disrespect, but he did so violently. Jake Armijo testified. Well, I mean, that suggests people acting, you know, ultramarous, for lack of a better term, people without authority deciding they're going to pull their gun out and shoot somebody. How does that take away the effect of them not supposed to be making a hit without people from a higher-up authorizing it? Well, I believe that was Leonard Lujan who made the statement during his testimony that you're not supposed to act without specific authorization, but there were these other examples of witnesses who spoke of taking S&M-related actions without specific S&M authorization. So I would suggest that this Court doesn't weigh that type of witness discrepancy, but rather just looks at whether the evidence was sufficient for the jury to draw the inference that, in this case, Joe and Andrew were motivated by the S&M connection. Doesn't the jury have to speculate here about a whole lot? I mean, did he ever hear of the negative comment? Did he have some reason to think that the gang had been insulted? Did he intend for the gang to know about it so that his status could be improved? Did he even have any status or care for any status at that point in his life? I mean, it just seems like it's inference upon inference here. We believe that the inferences would be reasonable, that the evidence supported that the message Burns asked Sleepy to deliver was delivered. We believe that the evidence is clear that Joe and Andrew committed the murder, and the way in which they committed it indicates the gang connection. So that would be any time you do a murder that is flamboyant, it must be gang-related? It would not be any time. It would need to have – well, in this case, there are additional facts. The facts that other people were involved, the facts that they told other people about it, the facts that it related to drug trafficking, which is the arena in which the S&M – You just, in response to a question from Judge Timkovich, you just indicated that there was no evidence that Burns was acting as a drug dealer for S&M. And that's true, but it's within – I mean, we've got two – the Gallegos brothers are obviously addicted, and they're buying multiple times a day from Mr. Burns, and there's just not much there to tell us how their dispute with their drug dealer connects to this prison gang. It happened within the drug trafficking community, and they could reasonably expect – Well, lots of things happen in the drug trafficking community that have nothing to do with S&M. I mean, they don't have a monopoly yet, do they, on drug trafficking? Correct. But we would submit that the evidence supports the inference because of the context in which the crime occurred that they could reasonably expect that someone else would learn about it. In fact, they learned that someone else did learn about it. But even if they didn't, it was a part of the S&M culture to respond violently to this type of disrespect. This is not like a road rage or a domestic violence. This is in a drug context. And the context requires them to be contemporary members, still members of the gang, members for life. I'm very sorry. I see I have two minutes over. Go ahead and finish. Yes. It does, but we believe the evidence supports that. There's no indication that they had withdrawn or renounced, and there was subsequent – If we concluded that the evidence was insufficient on gang membership, does the government lose? Not necessarily, because associates of the gang can still commit vicar crimes in order to maintain a relationship with the S&M. And the subsequent statements by Andrew, for example, of being with his homies in jail and telling Billy Cordova, look at us, we got away with it, would indicate that they still have that connection. But again, I would suggest there's no evidence that they renounced. Thank you, Counsel. Mr. Bowen, if you want some rebuttal time, we let him go over. Would you care for some? No, thank you, Your Honor. Thank you.